Ironwoods Troy, LLC v Optigolf Troy, LLC (2022 NY Slip Op 02323)

Ironwoods Troy, LLC v Optigolf Troy, LLC

2022 NY Slip Op 02323

Decided on April 7, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 7, 2022

532949
[*1]Ironwoods Troy, LLC, et al., Appellants,
v
Optigolf Troy, LLC, et al., Respondents.

Calendar Date:February 8, 2022

Before:Garry, P.J., Egan Jr., Pritzker, Colangelo and Ceresia, JJ.

Gleason, Dunn, Walsh & O'Shea, Albany (Richard C. Reilly of counsel), for appellants.
Maynard, O'Connor, Smith & Catalinotto, LLP, Albany (Bridget M. Schultz of counsel), for respondents.

Colangelo, J.
Appeal from an order of the Supreme Court (McNally Jr., J.), entered January 25, 2021 in Rensselaer County, which, among other things, granted defendants' motion for summary judgment dismissing the complaint.
In September 2015, defendant Mark Wekara, the owner of defendant OptiGolf Troy, LLC, entered into an asset purchase agreement (hereinafter APA) with plaintiffs for plaintiffs to purchase OptiGolf's seven golf simulators and other assets for $290,000.[FN1] The APA provided that plaintiffs would make monthly interest payments and turnover payments for the last three months of 2015, with the final balance to be paid in full by the closing date of January 29, 2016. In connection with the APA, plaintiffs Jeffrey Buell and Joshua Buell tendered a nonrefundable deposit of $30,000 and executed a personal guarantee for the purchase price. In December 2015, the Buells demanded recission of the APA and personal guarantee based upon purported misrepresentations made by Wekara during negotiations as to the operation of the business, including issues regarding a liquor license. Further, the Buells allegedly encountered technical difficulties with the simulators that resulted in plaintiff Ironwoods Troy, LLC generating less revenue than anticipated. Ironwoods Troy subsequently closed in March 2016, and no payments were made by plaintiffs after the deposit.
Plaintiffs commenced this action for fraud, rescission, breach of contract and unjust enrichment and sought a declaration finding the personal guarantee unenforceable. Defendants joined issue and counterclaimed for breach of contract and for declaratory relief on the personal guarantee. Following discovery, defendants moved for summary judgment dismissing the complaint and in favor of their counterclaims. Plaintiffs opposed and cross-moved for summary judgment on their causes of action. Supreme Court, among other things, granted defendants' motion for summary judgment dismissing the complaint, and for summary judgment on their counterclaim for breach of contract and for a declaration that the personal guarantee constitutes an enforceable contract. Plaintiffs appeal, and we affirm.
"[T]o recover for a breach of contract, a party must establish the existence of a contract, the party's own performance under the contract, the other party's breach of its contractual obligations, and damages resulting from the breach" (Collyer v LaVigne, 202 AD3d 1335, 1339-1340 [2022] [internal quotation marks, brackets and citations omitted]; accord Adirondack Classic Design, Inc. v Farrell, 182 AD3d 809, 811 [2020]). In support of their motion, defendants tendered, as relevant here, the affidavit of Wekara, deposition testimony of the Buells, the executed APA and personal guarantee,[FN2] and the delivery and acceptance statement with respect to the assets signed by Joshua Buell.[FN3] These submissions established the agreement between the parties, evidence of defendants' performance under the APA, evidence of the amount [*2]due and owing for the assets purchased and evidence of plaintiffs' failure to pay. Based upon the foregoing, Supreme Court correctly concluded that defendants satisfied their moving burden on their counterclaim for breach of contract and for declaratory relief (see Alvarez v Prospect Hosp., 68 NY2d 320, 324-325 [1986]; Stone Hill Capital Mgt. LLC v Bank of the W., 28 NY3d 439, 453-454 [2016]; George S. May Intl. Co. v Thirsty Moose, Inc., 19 AD3d 721, 722 [2005]). In opposition, plaintiffs failed to raise a triable issue of fact.
Addressing the allegations which formed the basis of plaintiffs' complaint for fraud, plaintiffs set forth that Wekara made several misrepresentations to them regarding, among other things, OptiGolf's value and potential earnings as an indoor golf simulator business and the condition of the simulators. "In an action to recover damages for fraud, the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing [the plaintiff] to rely upon it, justifiable reliance of [the plaintiff] on the misrepresentation or material omission, and injury" (Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996] [citations omitted]; accord Piller v Princeton Realty Assoc. LLC, 173 AD3d 1298, 1302 [2019]; see Gruber v Donaldsons, Inc., 201 AD3d 887, 888 [2022]). However, "[a] party cannot claim reliance on a misrepresentation when he or she could have discovered the truth with due diligence" (Avery v WJM Dev. Corp., 197 AD3d 1141, 1144 [2021] [internal quotation marks and citation omitted]). Moreover, alleged misrepresentations are not actionable as fraud when they consist of "mere puffery, opinions of value or future expectations, rather than false statements of value" Northern Group Inc. v Merrill Lynch, Piece, Fenner & Smith Inc., 135 AD3d 414, 414 [2016] [internal citations omitted]).
Plaintiffs' conclusory assertion that Wekara was to provide technical repairs is belied by Joshua Buell's deposition testimony that Wekara offered to provide assistance if something went wrong with the simulators, but that Wekara was never asked to come to Ironwoods Troy to make such repairs. With respect to the simulators, Jeffrey Buell testified that when Ironwoods Troy commenced operations, the simulators malfunctioned, and plaintiffs dispute Wekara's assertions that the simulators were in "new" condition and "had the latest technology installed on them." Jeffrey Buell testified at his deposition that it was his understanding that the simulators were new to the location and had been installed and in use for a number of months. Yet, in opposing defendants' motion, the Buells contend that they were informed by others that the simulators had previously been installed and used at another location, as proof that Wekara misled them as to the condition of the simulators. This claim, however, was supported only by hearsay and properly disregarded [*3]by the court. "[W]here the moving party has demonstrated its entitlement to summary judgment, the party opposing the motion must demonstrate by admissible evidence the existence of a factual issue," and hearsay "alone does not satisfy this requirement" (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). Moreover, prior to the sale, Joshua Bell inspected the location of OptiGolf at least twice and turned each simulator on and hit a golf ball to make sure that each swing "registered," which it did. Plaintiffs further claim that Wekara misrepresented the potential monthly earnings of the business. We find Wekara's alleged statement that the business had "the potential to make [$]450,000 +++" to be mere puffery rather than a false statement of value (see Northern Group Inc. v Merrill Lynch, Piece, Fenner & Smith Inc., 135 AD3d at 414).
Plaintiffs further claim that Wekara misrepresented that Ironwoods may be able to use OptiGolf's liquor license. Jeffrey Buell conceded, however, that he was aware that they would have to acquire their own liquor license. Additionally, according to Jeffrey Buell, Wekara misrepresented the number of outstanding gift certificates that OptiGolf had issued, yet Jeffrey Buell admitted that defendants offered to write off interest payments to settle the gift certificate issue. Finally, Jeffrey Buell explained that, as part of the APA, OptiGolf's stock of liquor was sold to Ironwoods and it was determined that much of this stock was expired and unsaleable. Yet, an email supplied by Wekara makes clear that plaintiffs were aware, prior to entry of the APA, that certain alcohol had expired and nevertheless proceeded with the purchase. Joshua Buell admitted that no interest or turnover payments were made to defendants because Ironwoods Troy did not generate enough revenue. Fatal to plaintiffs' fraud claim was their failure to establish that Wekara made misrepresentations that were false or known to be false or that plaintiffs exercised any due diligence. Wekara represented only that he was the developer of the simulators and that they were "proprietary." Although Wekara initially assigned a value of $45,000 per unit, Jeffrey Buell discounted each unit based upon his opinion that the simulators, once purchased, would lose value immediately and performed his own calculations as to what he believed the simulators were worth. Jeffrey Buell admitted that, prior to purchasing the assets, he did not perform any due diligence to investigate the indoor golf industry or obtain an independent appraisal of OptiGolf Troy's assets. Generally, the Buells did not conduct any in-depth market research with respect to the indoor golf business.
With regard to the personal guarantee, as Supreme Court found, the terms of the APA permit Wekara to legally enforce the personal guarantee if plaintiffs have not paid the remaining balance by the closing date. Plaintiffs failed to do so, defaulting almost immediately after the APA was [*4]signed by failing to make the first of the monthly interest payments or turnover payments. "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Tompkins Fin. Corp. v John M. Floyd & Assocs., Inc., 144 AD3d 1252, 1253 [2016]). The APA and personal guarantee comport with this standard. "[A] guarant[ee] is a promise to fulfill the obligations of another party, and is subject to the ordinary principles of contract construction" (Cooperative Centrale Raiffeisen-Boerenleenbank, B.A., "Rabobank Intl.," N.Y. Branch v Navarro, 25 NY3d 485, 492 [2015] [internal quotation marks and citations omitted]). Moreover, the guarantee explicitly provides that "[t]his guarantee is, and shall be deemed to be, a contract entered into under and pursuant to the laws of the state of New York and shall be in all respects governed, construed, applied and enforced in accordance with the laws of said [s]tate." The personal guarantee is signed and notarized. As such, Supreme Court properly declared that the personal guarantee constituted an enforceable contract.
In light of the above determinations, we find that Supreme Court did not err in denying plaintiffs' motion for summary judgment on their causes of action for rescission of the contract based upon fraud or breach of contract, and in granting summary judgment to defendants (see Collyer v LaVigne, 202 AD3d at 1340; GRJH, Inc. v 3680 Props., Inc., 179 AD3d 1177, 1179 [2020]). To the extent not specifically addressed herein, plaintiffs' remaining arguments have been reviewed and found to be without merit.
Garry, P.J., Egan Jr., Pritzker and Ceresia, JJ., concur.
Ordered that order is affirmed, with costs.

Footnotes

Footnote 1: This was the second APA. The first APA was signed on August 24, 2015 between plaintiff Jeffrey Buell, plaintiff Joshua Buell and Wekara. Upon the formation of plaintiff Ironwoods Troy, LLC, the second APA was signed to reflect Ironwoods Troy as the purchaser of OptiGolf's assets.

Footnote 2: The Buells, individually and as officers of Ironwoods, agreed to pay for the simulators pursuant to the terms established in the APA.

Footnote 3: The delivery and acceptance statement, signed by Joshua Buell on September 9, 2015, states: "We, Ironwoods Troy LLC, agree and accept all assets, pointed out and now sold as per [the APA] between us and Mark Wekara/OptiGolf Troy LLC, as they are where they are."